1    C. Mark Whitehead, III (Bar No. 27682)
     The Whitehead Law Firm, L.L.C.
2    Post Office Box 81007
     Lafayette, LA 70598
3    337 740-6006 Telephone
     337 740-6002  Facsimile
4

5    Attorney for Plaintiffs

6

7

8                 UNITED STATES DISTRICT COURT

9           FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                   (SAN FRANCISCO DIVISION)

11

| | |
|---|---|
| 12   Melvin and Frances Davis, et al | Case No. _____ |
| 13            Plaintiffs, | **CIVIL COMPLAINT** |
| 14   v. | |
| 15   PFIZER INC., PHARMACIA | **JURY TRIAL DEMANDED** *CRB* |
|      CORPORATION, and G.D. SEARLE, LLC, | |
| 16 | |
| 17           Defendants. | |

18

19       MELVIN and FRANCES DAVIS (hereinafter referred to as "Plaintiff Davis");

20 MILDRED and ALFRED FREENY (hereinafter referred to as "Plaintiff Freeny"); EDDIE and

21 MARY COBURN (hereinafter referred to as "Plaintiff Coburn"); ERNEST and LINDA SMITH

22 (hereinafter referred to as "Plaintiff Smith"); WILLIAM and DOROTHY ALLEN (hereinafter

23 referred to as "Plaintiff Allen"); GENEVA WILLIAMS (hereinafter referred to as "Plaintiff

24 Williams"); GERALDINE and RICHARD ANDERSON (hereinafter referred to as "Plaintiff

25 Anderson"); ROSALYN COLEMAN (hereinafter referred to as "Plaintiff Coleman"); RUBY

26 BELL (hereinafter referred to as "Plaintiff Bell"); MARY WADE (hereinafter referred to as

27 "Plaintiff Wade"); HURKET JACKSON, JR. (hereinafter referred to as "Plaintiff JACKSON,");

28

DENNIS and ANITA BENNETT (hereinafter referred to as "Plaintiff Bennett"); PEGGY and CARL KEYS (hereinafter referred to as "Plaintiff Keys"); THEODORE GAINES, individually, as personal representative of and on behalf of WALTER TAYLOR (hereinafter referred to as "Plaintiff Gaines"); MARGARET PATTON, individually, as personal representative of and on behalf of ORIS PATTON (hereinafter referred to as "Plaintiff Patton"); and DARRYL and BEVERLY HALL (hereinafter referred to as "Plaintiff Hall") through counsel, bring this action against Defendants PFIZER INC., PHARMACIA CORPORATION, and G.D. SEARLE, LLC (hereafter collectively "Defendants") and alleges as follows:

**I. PARTIES**

1.     This is an action for damages arising from Defendants' design, manufacture, sale, testing, marketing, advertising, promotion, and/or distribution of the unsafe medication Valdecoxib, trade name Bextra®.

2.     Plaintiff DAVIS is an individual who is a citizen of the state of Mississippi, and a resident of Amite County, Mississippi.

3.     Plaintiff FREENY is an individual who is a citizen of the state of Mississippi, and a resident of Lincoln County, Mississippi.

4.     Plaintiff COBURN is an individual who is a citizen of the state of Mississippi, and a resident of Winston County, Mississippi.

5.     Plaintiff SMITH is an individual who is a citizen of the state of Mississippi, and a resident of Copiah County, Mississippi.

6.     Plaintiff ALLEN is an individual who is a citizen of the state of Mississippi, and a resident of Hinds County, Mississippi.

7.     Plaintiff WILLIAMS is an individual who is a citizen of the state of Mississippi, and a resident of Pikes County, Mississippi.

- 2 -

8.    Plaintiff ANDERSON is an individual who is a citizen of the state of Mississippi, and a resident of Hinds County, Mississippi.

9.    Plaintiff COLEMAN is an individual who is a citizen of the state of Mississippi, and a resident of Hinds County, Mississippi.

10.    Plaintiff BELL is an individual who is a citizen of the state of Mississippi, and a resident of Washington County, Mississippi.

11.    Plaintiff WADE is an individual who is a citizen of the state of Mississippi, and a resident of Rankin County, Mississippi.

12.    Plaintiff JACKSON is an individual who is a citizen of the state of Mississippi, and a resident of Panola County, Mississippi.

13.    Plaintiff BENNETT is an individual who is a citizen of the state of Mississippi, and a resident of Yalobusha County, Mississippi.

14.    Plaintiff PATTON is an individual who is a citizen of the state of Mississippi, and a resident of Rankin County, Mississippi.

15.    Plaintiff KEYS is an individual who is a citizen of the state of Mississippi, and a resident of Copiah County, Mississippi.

16.    Plaintiff TAYLOR is an individual who is a citizen of the state of Mississippi, and a resident of Hinds County, Mississippi.

17.    Plaintiff HALL is an individual who is a citizen of the state of North Dakota, and a resident of Mountrail County, North Dakota.

18.    Defendant Pfizer Inc. ("Pfizer") is a Delaware corporation with its principal place of business in New York, New York. In 2003, Pfizer acquired Pharmacia Corporation for nearly $60 billion. At all relevant times Pfizer and/or its predecessors in interest were engaged in the business of designing, testing, manufacturing, packaging, marketing, distributing, promoting,

1  and selling the drug Valdecoxib, under the trade name BEXTRA® in California, Mississippi,
2  Illinois and nationwide.

3        19.    Defendant G. D. Searle, LLC, formerly known as G. D. Searle & Co.
4  ("Searle") is a Delaware corporation with its principal place of business in Illinois. At all relevant
5  times, Searle has been engaged in the business of marketing and selling BEXTRA® nationwide
6  and in California, Mississippi and Illinois. Searle is a subsidiary of Pfizer, acting as its agent and
7  alter ego in all matters alleged within this Complaint.

8        20.    Defendant Pharmacia Corporation ("Pharmacia ") is a Delaware corporation
9  with its principal place of business in New Jersey. At all relevant times, Pharmacia, and its
10 predecessors in interest have been engaged in the business of designing, testing, manufacturing,
11 packaging, marketing, distributing, promoting, and selling BEXTRA® nationwide and in
12 California, Michigan and Illinois.

13 **II.    JURISDICTION AND VENUE**

14       21.    This is an action for damages, which exceeds seventy-five thousand dollars
15 ($75,000.00).

16       22.    There is complete diversity of citizenship between the Plaintiffs and
17 Defendants. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.A. §
18 1332 (diversity jurisdiction) because the amount in controversy exceeds $75,000.00, and because
19 there is complete diversity of citizenship between Plaintiffs and Defendants.

20       23.    Venue is proper in this United States Judicial District pursuant to 28
21 U.S.C.A. § 1391. Defendants marketed, advertised and distributed the dangerous product in the
22 district, thereby receiving substantial financial benefit and profits the dangerous product in this
23 district, and reside in this district under 28 U.S.C.A. § 1391(c), such that venue is proper.

24       24.    At all relevant times herein, Defendants were in the business of designing,
25 manufacturing, marketing, developing, testing, labeling, promoting, distributing, warranting and
26 selling their product, BEXTRA®. Defendants at all times relevant hereto designed, developed,
27 manufactured, promoted, marketed, distributed, tested, warranted and sold in interstate commerce
28 (including California and Michigan) the aforementioned prescription drug. Defendants do

1  substantial business in the State of California and within this Federal Judicial District, advertise in
2  this district, receive substantial compensation and profits from sales of BEXTRA® in this District,
3  and made material omissions and misrepresentations and breaches of warranties in this District so
4  as to subject them to *in personam* jurisdiction in this District.  In engaging in the conduct alleged
5  herein each defendant acted as the agent for each of the other defendants, or those defendant's
6  predecessors in interest.

7  **III.    INTERDISTRICT ASSIGNMENT**

8      25.    Assignment to the San Francisco Division is proper as this action is related
9  to *In Re: Bextra® and Celebrex Marketing Sales Prac. and Pro. Liab. Lit.*, MDL-1699, assigned to
10  the Honorable Charles R. Breyer by the Judicial Panel on Multidistrict Litigation on September 6,
11  2005.

12  **IV.    FACTUAL BACKGROUND**

13      **A.    Facts Regarding Plaintiff's**

14

15      26.    Plaintiff DAVIS ingested BEXTRA® and CELEBREX® as prescribed from
16  approximately August 2002 until approximately May 2005.  As a result of taking BEXTRA® and
17  CELEBREX®, Plaintiff suffered a heart attack May 23, 2005.

18      27.    Plaintiff FREENY ingested BEXTRA® as prescribed from approximately
19  July 12, 2002 until approximately March 1, 2005.  As a result of taking BEXTRA®, Plaintiff
20  suffered a Myocardial Infarction on March 1, 2005.

21      28.    Plaintiff COBURN ingested BEXTRA® as prescribed from approximately
22  January 17, 2004 until April of 2004.  As a result of taking BEXTRA®, Plaintiff suffered a
23  Myocardial Infarction on April 9, 2004.

24      29.    Plaintiff SMITH ingested BEXTRA® as prescribed from approximately
25  September 27, 2002 until approximately June 4, 2004.  As a result of taking BEXTRA®, Plaintiff
26  suffered a Myocardial Infarction on January 26, 2004.

27
28

1    30.    Plaintiff ALLEN ingested BEXTRA® as prescribed from approximately

2   September 2002 until approximately September 2004.  As a result of taking BEXTRA®, Plaintiff

3   suffered a Stroke on or about March 2004.

4    31.    Plaintiff   WILLIAMS   ingested   BEXTRA®   as   prescribed   from

5   approximately January 3, 2003 until approximately February 13, 2005.  As a result of taking

6   BEXTRA®, Plaintiff suffered a Myocardial Infarction on January 12, 2005.

7    32.    Plaintiff   ANDERSON   ingested   BEXTRA®   as   prescribed   from

8   approximately April 23, 2004 until approximately November 1, 2004.  As a result of taking

9   BEXTRA®, Plaintiff suffered a Myocardial Infarction on September 4, 2004.

10   33.    Plaintiff COLEMAN ingested BEXTRA® as prescribed from approximately

11   2001 until approximately July of 2004.  As a result of taking BEXTRA®, Plaintiff suffered a

12   Myocardial Infarction on July 13, 2004.

13   34.    Plaintiff BELL ingested BEXTRA® as prescribed from approximately

14   December of 2003 until approximately March 28, 2004.  As a result of taking BEXTRA®,

15   Plaintiff suffered a Myocardial Infarction on March 28, 2004.

16   35.    Plaintiff WADE ingested BEXTRA® as prescribed from approximately

17   November 2004 until approximately February of 2005.  As a result of taking BEXTRA®, Plaintiff

18   suffered a Myocardial Infarction and Cerebral Vascular Accident in February 2005.

19   36.    Plaintiff JACKSON ingested BEXTRA® as prescribed from approximately

20   February of 2002 until approximately April of 2005.  As a result of taking BEXTRA®, Plaintiff

21   suffered a Myocardial Infarction on April of 2004.

22   37.    Plaintiff BENNETT ingested BEXTRA® as prescribed from approximately

23   2002 until approximately 2005.  As a result of taking BEXTRA®, Plaintiff suffered a Myocardial

24   Infarction in February 2003.

25   38.    Plaintiff PATTON ingested BEXTRA® as prescribed from approximately

26   September 2004 until approximately January 18, 2005.  As a result of taking BEXTRA®, Plaintiff

27   suffered a Myocardial Infarction on January 18, 2005.

28

- 6 -

1    39. Plaintiff KEYS ingested BEXTRA® as prescribed from approximately May

2 10, 2002 until approximately March 25, 2005. As a result of taking BEXTRA®, Plaintiff suffered

3 a Stroke on March 3, 2004.

4    40. Plaintiff TAYLOR ingested BEXTRA® as prescribed from approximately

5 May 3, 2004 until approximately April 2005. As a result of taking BEXTRA®, Plaintiff Died on

6 February 14, 2005.

7    41. Plaintiff HALL ingested BEXTRA® as prescribed from approximately

8 February 9, 2004 until approximately November 2004. As a result of taking BEXTRA®, Plaintiff

9 suffered a Stroke on October 31, 2004.

10    42. Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS,

11 ANDERSON, COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR

12 and HALL's healthcare providers could not have reasonably known or have learned through

13 reasonable diligence that such injury directly resulted from Defendants' negligent and otherwise

14 culpable acts, omissions, and misrepresentations or from Plaintiffs ingestion of BEXTRA®.

15    43. Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS,

16 ANDERSON, COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR

17 and HALL used BEXTRA® in a proper and reasonably foreseeable manner and used it in a

18 condition that was substantially the same as the condition in which it was manufactured and sold.

19    44. Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS,

20 ANDERSON, COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR

21 and HALL would not have used BEXTRA® had Defendants properly disclosed the risks

22 associated with the drug.

23    **B.**  **Facts Regarding Bextra® and Bextra's Market Launch**

24    45. Bextra® is one of a class of pain medications called non-steroidal anti-

25 inflammatory drugs ("NSAIDs"). Aspirin, naproxen (trade name Aleve), and ibuprofen (trade

26 name Advil) are examples of well-known NSAIDs.

27

28

- 7 -

1      46.    NSAIDs reduce pain by blocking the body's production of pain transmission

2 enzymes called cycloxygenase or "COX." There are two forms of COX enzymes—COX-1 and

3 COX-2. Aspirin, naproxen and ibuprofen all act by blocking COX-1 and COX-2 enzymes.

4      47.    In addition to decreasing inflammation, the prostaglandins that are supported

5 by COX-1 enzymes are involved in the production of gastric mucus; this protects the stomach wall

6 from the hydrochloric acid present in the stomach. It is generally accepted in the medical

7 community that by blocking the COX-1 enzyme, the body's ability to protect gastric tissue is

8 hampered and as a result, can cause harmful gastrointestinal side effects, including stomach

9 ulceration and bleeding.

10      48.    Prostaglandin I2 is the predominant cyclooxygenase product in endothelium,

11 inhibiting platelet aggregation (preventing clot formation), causing vasodilation, and preventing

12 the proliferation of vascular smooth muscle. Whereas older NSAIDS inhibit Thromboxane A2 and

13 Prostaglandin I2, the COX-2 inhibitors leave Thromboxane A2 unaffected. Thromboxane A2 is a

14 potent platelet aggregator and vasoconstrictor, which is synthesized by platelets. Therefore, while

15 the older NSAIDS suppress platelet aggregation and vasoconstriction, the COX-2 inhibitors

16 support it.

17      49.    Traditional NSAIDs like aspirin reduce pain/inflammation and therefore

18 pain by inhibiting both COX-1 and COX-2 enzymes simultaneously. As would be expected,

19 traditional NSAIDs may cause ulcers in the stomach. However, traditional NSAIDs do not cause

20 blood clots, rather they actually reduce the risk of clots and help protect heart function.

21      50.    Defendants and other pharmaceutical companies set out to remedy these

22 ulcer and bleeding problems suffered by some NSAID users by developing "selective" inhibitors

23 that would block only COX-2 production, thus (supposedly) allowing the proper maintenance of

24 gastric tissue while still reducing inflammation.

25      51.    In making this decision, Defendants and their predecessors in interest either

26 intentionally ignored or recklessly disregarded current medical knowledge that selective COX-2

27 inhibition lowers prostacyclin levels and causes thromboxane $A_2$ to be uninhibited, causing blood

28

1  clots, and giving rise to various clot-related cardiovascular events, including heart attack, stroke,

2  unstable angina. The vasoconstriction and fluid retention cause the hypertension.

3         52.    Pfizer launched Celebrex, the first of the three major COX-2 inhibitor drugs,

4  in early 1999 and initiated a massive marketing campaign to convince doctors and consumers of

5  the superiority of their new "blockbuster" drug over less inexpensive NSAIDs. In May 1999,

6  Merck & Co., Inc. ("Merck") launched Vioxx, its own selective COX-2 inhibitor.

7         53.    Seeking increased market share in this extremely lucrative market,

8  Defendants, and their predecessors in interest, also sought approval of a "second generation"

9  selective COX-2 inhibitor and filed for FDA approval of Bextra® on January 16, 2001 for the

10  (i) prevention and treatment of acute pain, (ii) treatment of primary dysmenorrhea, and (iii) relief

11  of the signs and symptoms of osteoarthritis and adult rheumatoid arthritis.

12         54.    The FDA granted approval of the new drug on November 16, 2001, for two

13  particular uses: (i) treatment of primary dysmenorrhea and (ii) relief for the signs and symptoms

14  of osteoarthritis and rheumatoid arthritis.

15         55.    The FDA did not grant approval to market and promote Bextra® for the

16  management or prevention of acute pain.

17         56.    The FDA did not grant approval to promote Bextra® as more effective than

18  other NSAIDs in preventing clinically serious gastrointestinal events such as perforations, ulcers or

19  gastric bleeding.

20         57.    Even without a label that allowed Defendants to legitimately claim superior

21  safety, when Defendants, and their predecessors-in-interest, began marketing Bextra® in early

22  2002, Defendants and their representatives and agents misrepresented the safety profile of Bextra®

23  to consumers, including Plaintiff, the medical community, healthcare providers, and third party

24  payers. Defendants proceeded to promote, market, sell, and distribute Bextra® as a much safer

25  and more effective pain reliever than other NSAIDs, such as aspirin, naproxen, and ibuprofen.

26         **C.    Facts Regarding Bextra®'s Safety and Defendants' Knowledge Thereof.**

27         58.    The potential for cardiovascular risk of selective COX-2 inhibitors was

28  known to Defendants long before the FDA granted market approval in November 2, 2001. By

- 9 -

1   1997, and prior to the submission of the New Drug Application (the "NDA") for Bextra®,
2   Defendants was aware that, by inhibiting COX-2, Bextra® altered the homeostatic balance
3   between prostacylcin synthesis and thromboxane and thereby, increased the prothrombotic effects
4   of the drugs, causing blood clots to form in those who ingested it. *See* Topol, E.J., *et al.*, *Risk of*
5   *Cardiovascular Events Associated with Selective Cox-2 Inhibitors, JAMA*, August 22, 2001 at 954.
6   Although all COX-2 inhibitors have this mechanism of action, Bextra® was the most selective
7   COX-2 inhibitor proposed for approval. Accordingly, it had the greatest potential to cause adverse
8   cardiovascular and cerebrovascular events.

9          59.    As Pharmacologist, Dr. Garrett Fitzgerald, of the University of
10  Pennsylvania, reported in an editorial published in *The New England Journal of Medicine* on
11  October 21, 2004, that it was known as early as 1999 that selective COX-2 inhibitors, such as
12  Bextra®, suppressed the formation of prostaglandin I-2 in healthy volunteers, inhibited platelet
13  aggregation in vitro, and may predispose patients to myocardial infarction or thrombotic stroke.

14         60.    Nevertheless, on January 16, 2001, Defendants submitted an NDA to the
15  FDA for Bextra®, omitting information about the extent of the risks associated with Bextra®.
16  Without a complete picture of the potential hazards associated with the drug, the FDA approved
17  Bextra® on or about November 16, 2001.

18         61.    Based on the studies performed on Celebrex, Vioxx, Bextra®, and other
19  COX-2 inhibitors, and basic research on this type of selective inhibitor which had been widely
20  conducted, Defendants knew when Bextra® was being developed and tested that selective COX-2
21  inhibitors posed serious cardiovascular risks for anyone who took them, and presented a specific
22  additional threat to anyone with existing heart disease or cardiovascular risk factors. Studies show
23  that selective COX-2 inhibitors, including Bextra®, decrease blood levels of a prostacyclin. When
24  those levels fall, the arteries are more vulnerable to clotting, high blood pressure, heart attack, and
25  stroke.

26         62.    On December 9, 2004, the FDA issued new information on side effects
27  associated with the use of Bextra® and required the addition of certain warnings to, and the
28  strengthening of other warnings on, the Bextra® label. The enhanced warnings followed in the

1    wake of the results of additional cardiovascular studies performed by Defendants, as well as
2    numerous complaints to the FDA regarding severe skin reactions.

3            63.    Yet well prior to this warning, Defendants had knowledge of the coronary
4    and cardiovascular safety risks of Bextra® from several studies. *See e.g.*, Otto, E.O., *Efficacy and*
5    *Safety of the Cyclooxygenase 2 Inhibitors Parecoxib and Valdecoxib in Patients Undergoing*
6    *Coronary Artery Bypass Surgery*, *The Journal of Thoracic and Cardiovascular Surgery*, June 2003
7    at 1481.

8            64.    Even Defendants' own (and Pfizer funded) post- drug approval meta-
9    analysis study (first presented on March 31, 2003 and again on May 15, 2003) included this data
10   showing an increased cardiovascular risk in patients treated with Bextra® after undergoing
11   coronary artery bypass graft surgery.  Observed events included heart attack, stroke, and blood
12   clots in the legs and lungs.  The results were particularly relevant and striking as each of the study
13   participants who were a post-bypass surgery patient was taking anti-clotting agents at the time their
14   exposure to Bextra® was being tracked.

15           65.    In mid-January 2005, a peer-reviewed paper from the University of
16   Pennsylvania found that in patients having heart bypass surgery, those who took Bextra® in the
17   intravenous form, parecoxib, as opposed to a placebo, were three times more likely to have a heart
18   attack or stroke.

19           66.    From February 16-18, 2005, the FDA's Drug Safety and Risk Management
20   Advisory Committee and the Arthritis Drug Advisory Committee met jointly to further examine
21   the safety of COX-2 inhibitors.  There, FDA Office of Drug Safety Officer David Graham testified
22   that selective COX-2 inhibitors increase the risk for adverse cardiovascular events at about the
23   same rate as cigarette smoking, hypertension, and diabetes.

24           67.    Despite years of studies on selective COX-2 inhibitors, as well as the
25   disturbing new studies specifically analyzing the risks of Bextra®, Defendants failed to take any
26   action to protect the health and welfare of patients, but instead, continued to promote the drug for
27   sale even after the FDA's Drug Safety and Risk Management Advisory Committee and Arthritis
28   Drug Advisory Committee meetings.

1          68.    On April 7, 2005, the FDA finally insisted that Defendants "voluntarily

2  withdraw" Bextra® from the U.S. market, stating:

3                "... the Agency has concluded that the overall risk versus benefit
profile of Bextra® is unfavorable.  This conclusion is based on the
4                potential increased risk for serious cardiovascular (CV) adverse
events, which appears to be a class effect of non-steroidal anti-
5                inflammatory drugs (NSAIDs) (excluding aspirin), an increased
risk of serious skin reactions (e.g. toxic epidermal necrolysis,
6                Stevens-Johnson syndrome, erythema multiforme) compared to
other NSAIDs, and the fact that Bextra® has not been shown to
7                offer any unique advantage over the other available NSAIDs."

8          69.    FDA Alert for Healthcare Professionals, April 7, 2005.

9  Continuing, the FDA noted:

10               "Bextra® has been demonstrated to be associated with an
increased risk of serious adverse CV events in two short-term trials
11               in patients immediately post-operative from coronary artery bypass
graft (CABG) surgery .... FDA has concluded that it is reasonable
12               to extrapolate the adverse CV risk information for Bextra® from
the short-term CABG trials to chronic use given the fact that other
13               COX-2 selective NSAIDs have been shown in long-term controlled
clinical trials to be associated with an increased risk of serious
14               adverse CV events (e.g., death, MI, stroke), and the well described
risk of serious, and often life-threatening gastrointestinal
15               bleeding .... To date, there have been no studies that demonstrate
an advantage of Bextra® over other NSAIDs that might offset the
16               concern about the[] serous skin risks, such as studies that show a GI
safety benefit, better efficacy compared to other products, or
17               efficacy in a setting of patients who are refractory to treatment with
other products."

18          70.    The scientific data available during and after Bextra®'s approval process

19  made clear to Defendants that their formulation of Bextra® would cause a higher risk of blood

20  clots, stroke and/or myocardial infarctions among Bextra® consumers, alerting them to the need to

21  do additional and adequate safety studies.

22          71.    As stated by Dr. Topol on October 21, 2004, in *The New England Journal of*

23  *Medicine*, outlining Defendants' failure to have conducted the necessary trials before marketing to

24  humans "... it is mandatory to conduct a trial specifically assessing cardiovascular risk and

25  benefit of (COX-2 inhibitors).  Such a trial needed to be conducted in patients with established

26  coronary artery disease, who frequently have coexisting osteoarthritis requiring medication and

27  have the highest risk of further cardiovascular events."

28

1    72.    Dr. Topol was also the author on the study published in August 2001 in
2 JAMA (listed above) that reported an increased risk of thrombotic cardiovascular events in persons
3 who used COX-2 inhibitors.

4    73.    Based upon readily available scientific data, Defendants knew, or should
5 have known, that their pre-approval testing of Bextra® did not adequately represent the cross-
6 section of individuals who were intended consumers and therefore, likely to take Bextra®.
7 Therefore, Defendants' testing and studies were grossly inadequate. *See, e.g.*, PDR entry for
8 Bextra® (noting that: "**Platelets**: In four clinical studies with young and elderly (>/=65 years)
9 subjects, single and multiple doses up to 7 day mg BID had no effect on platelet aggregation").

10    74.    Had Defendants done adequate testing prior to approval and "market
11 launch," rather than the extremely short duration studies done on the small size patient base that
12 was actually done) Pharmacia and Searle's scientific data would have revealed significant
13 increases in incidence of strokes and myocardial infarctions among the intended and targeted
14 population of Bextra® consumers. Adequate testing would have shown that Bextra® possessed
15 serious side effects for individuals such as Plaintiffs. Defendants should have taken appropriate
16 measures to ensure that their defectively designed product would not be placed in the stream of
17 commerce and/or should have provided full and proper warnings accurately and fully reflecting the
18 scope and severity of symptoms of those side effects should have been made.

19    75.    In fact, post-market approval data did reveal increased risks of clotting,
20 stroke and myocardial infarction, but this information was intentionally suppressed by Defendants
21 in order for them to gain significant profits from continued Bextra® sales.

22    76.    Defendants' failure to conduct adequate testing and/or additional testing
23 prior to "market launch" was based upon their desire to generate maximum financial gains for
24 themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2
25 inhibitor market.

26    77.    At the time Defendants manufactured, advertised, and distributed Bextra®
27 to consumers, Defendants intentionally or recklessly ignored and/or withheld information
28 regarding the increased risks of hypertension, stroke and/or myocardial infarctions because

- 13 -

1   Defendants knew that if such increased risks were disclosed, consumers such as Plaintiffs would

2   not purchase Bextra®, but instead would purchase other cheaper and safer NSAIDs.

3          **D.      Facts Regarding Defendants' Marketing and Sale of Bextra®**

4          78.     Plaintiffs and at all times relevant herein, Defendants engaged in a

5   marketing campaign with the intent that consumers would perceive Bextra® as a safer and better

6   drug than its other NSAIDs and, therefore, purchase Bextra®.

7          79.     Defendants widely and successfully marketed Bextra® throughout the

8   United States by, among other things, conducting promotional campaigns that misrepresented the

9   efficacy of Bextra® in order to induce a widespread use and consumption.   Bextra® was

10  represented to aid the pain and discomfort of arthritis, osteoarthritis, and related problems.

11  Defendants made misrepresentations by means of media advertisements, and statements contained

12  in sales literature provided to Plaintiff's prescribing physicians.

13         80.     Despite knowledge of the dangers presented by Bextra®, Defendants and

14  Defendants' predecessors in interest, through their officers, directors and managing agents for the

15  purpose of increasing sales and enhancing its profits, knowingly and deliberately failed to remedy

16  the known defects of Defendants' product, Bextra®, and failed to warn the public, including

17  Plaintiffs, of the serious risk of injury occasioned by the defects inherent in Defendants' product,

18  Bextra®®.  Defendants and their officers, agents and managers intentionally proceeded with the

19  inadequate safety testing, and then the manufacturing, sale and marketing of Defendants' product,

20  Bextra®, knowing that persons would be exposed to serious potential danger, in order to advance

21  their own pecuniary interests.   Defendants' conduct was wanton and willful, and displayed a

22  conscious disregard for the safety of the public and particularly of Plaintiffs.

23         81.     In an elaborate and sophisticated manner, Defendants aggressively marketed

24  Bextra® directly to consumers and medical professionals (including physicians and leading

25  medical scholars) in order to leverage pressure on third party payers, medical care organizations,

26  and large institutional buyers (*e.g.*, hospitals) to include Bextra® on their formularies.  Faced with

27  the increased demand for the drug by consumers and health care professionals that resulted from

28  Defendants' successful advertising and marketing blitz, third party payers were compelled to add

- 14 -

1 Bextra® to their formularies. Defendants' marketing campaign specifically targeted third party

2 payers, physicians, and consumers, and was designed to convince them of both the therapeutic and

3 economic value of Bextra®.

4         82.    Defendants represented that Bextra® was similar to ibuprofen and naproxen

5 but was superior because it lacked any of the common gastrointestinal adverse side effects

6 associated with these and other non-steroidal anti-inflammatory drugs ("NSAIDS"). For instance,

7 NSAIDS can, in certain patients, cause gastrointestinal perforations, ulcers and bleeding with long-

8 term use. Defendants promoted Bextra® as a safe and effective alternative that would not have the

9 same deleterious and painful impact on the gut, but that would be just as effective, if not more so,

10 for pain relief.

11         83.    Bextra® possessed dangerous and concealed or undisclosed side effects,

12 including the increased risk of serious cardiovascular events, such as heart attacks, unstable angina,

13 cardiac clotting, deep vein thrombosis, hypertension, and cerebrovascular events, such as strokes.

14 In addition, Bextra® was no more effective than traditional and less expensive NSAIDs and, just

15 like traditional NSAIDs, carried a risk of perforations, ulcers, and gastrointestinal bleeding.

16 Defendants chose not to warn about these risks and dangers.

17         84.    Defendants knew of these risks before the U.S. Food and Drug

18 Administration (the "FDA") approved Bextra® for sale on November 16, 2001, but Defendants

19 ignored, downplayed, suppressed, omitted, and concealed these serious safety risks and denied

20 inefficacy in its promotion, advertising, marketing, and sale of Bextra®. Defendants' omission,

21 suppression, and concealment of this important information enabled Bextra® to be sold to, and

22 purchased, or paid for by, the Consumers at a grossly inflated price.

23         85.    Consequently, Bextra® captured a large market share of anti-inflammatory

24 drugs prescribed for and used by patients. In 2002 alone (after a drug launch in March of 2002),

25 sales of Bextra® exceeded $1.5 billion, despite the significantly higher cost of Bextra® as

26 compared to other pain relievers in the same family of drugs.

27         86.    It was not until April 7, 2005, that Defendants finally acknowledged

28 Bextra®'s deleterious side effects and announced that they were withdrawing the drug from the

1  worldwide market based on what it misleadingly termed "new" and "unexpected" evidence linking

2  Bextra® to an increased risk of heart attacks and strokes.

3         87.    Had Defendants done adequate testing prior to approval and "market

4  launch," Pharmacia's scientific data would have revealed significant increases in stroke and

5  myocardial infarction amongst the intended population of Bextra® consumers. Adequate testing

6  would have shown that Bextra® possessed serious side effects. Defendants should have taken

7  appropriate measures to ensure that their defectively designed product would not be placed in the

8  stream of commerce and/or should have provided full and proper warnings accurately and fully

9  reflecting the scope and severity of symptoms of those side effects should have been made.

10         88.    In fact, post-market approval data did reveal increased risks of clotting,

11  stroke and myocardial infarction, but this information was intentionally suppressed by Defendants

12  in order for them to gain significant profits from continued Bextra® sales.

13         89.    Defendants' failure to conduct adequate testing and/or additional testing

14  prior to "market launch" was based upon their desire to generate maximum financial gains for

15  themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2

16  inhibitor market.

17         90.    At the time Defendants manufactured, advertising, and distributed Bextra®

18  to consumers, Defendants intentionally or recklessly ignored and/or withheld information

19  regarding the increased risks of hypertension, stroke and/or myocardial infarctions because

20  Defendants knew that if such increased risks were disclosed, consumers such as plaintiff would not

21  purchase Bextra®, but instead would purchase other cheaper and safer NSAID drugs.

22         91.    At all times relevant herein, Defendants engaged in a marketing campaign

23  with the intent that consumers, including plaintiff, and their doctors would perceive Bextra® as a

24  better drug than its competitors and, therefore, purchase Bextra®.

25         92.    Defendants widely and successfully marketed Bextra® throughout the

26  United States by, among other things, conducting promotional campaigns that misrepresented the

27  efficacy of Bextra® in order to induce a widespread use and consumption. Bextra® was

28  represented to aid the pain and discomfort of arthritis, osteoarthritis, and related problems.

1  Defendants made misrepresentations by means of media advertisements, and statements contained

2  in sales literature provided to Plaintiffs prescribing physicians.

3          93.    Prior to manufacturing, sale and distribution of Bextra®, Defendants,

4  through their officers, director and managing agents, had notice and knowledge from several

5  sources, that Bextra® presented substantial and unreasonable risks of harm to the consumer. As

6  such, Bextra® consumers, including Plaintiffs, were unreasonably subject to risk of injury or death

7  from the consumption of Defendants' product, Bextra®. Despite such knowledge, Defendants and

8  Defendants' predecessors in interest, through their officers, directors and managing agents for the

9  purpose of increasing sales and enhancing its profits, knowingly and deliberately failed to remedy

10  the known defects of Defendants' product, Bextra®, and failed to warn the public, including

11  Plaintiffs, of the serious risk of injury occasioned by the defects inherent in Defendants' product,

12  Bextra®. Defendants and their officers, agents and managers intentionally proceeded with the

13  inadequate testing, and then the manufacturing, sale and marketing of Defendants' product,

14  Bextra®, knowing that persons would be exposed to serious potential danger, in order to advance

15  their own pecuniary interests. Defendants' conduct was wanton and willful, and displayed a

16  conscious disregard for the safety of the public and particularly of Plaintiffs.

17

18  **CLAIMS FOR RELIEF**

19  **FIRST CLAIM FOR RELIEF:**
   **Negligence**

20          94.    Plaintiffs incorporate by reference all of the paragraphs of this Complaint as

21  if fully set forth herein.

22          95.    Defendants owed Plaintiffs DAVIS, FREENY, COBURN, SMITH,

23  ALLEN, WILLIAMS, ANDERSON, COLEMAN, BELL, WADE, JACKSON, BENNETT,

24  PATTON, KEYS, TAYLOR and HALL a duty to exercise reasonable care when designing,

25  manufacturing, marketing, advertising, distributing, and selling Bextra®. This duty included the

26  duty not to introduce a pharmaceutical drug, such as Bextra®, into the stream of commerce that

27  caused users to suffer from unreasonable, dangerous or untoward adverse side effects.

28

- 17 -

1    96.    At all relevant times to this action, Defendants owed a duty to properly warn

2    Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS, ANDERSON,

3    COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR and HALL

4    and the Public of the risks, dangers and adverse side effects of their pharmaceutical drug Bextra®.

5    97.    Defendants breached their duties by failing to exercise ordinary care in the

6    preparation, design, research, testing, development, manufacturing, inspection, labeling, marketing,

7    promotion, advertising and selling of Bextra®, including:

8    a.    failing to use due care in the preparation and development of

9    Bextra® to prevent the aforementioned risk of injuries to individuals when the drugs were

10    ingested;

11    b.    failing to use due care in the design of Bextra® to prevent the

12    aforementioned risk of injuries to individuals when the drugs were ingested;

13    c.    failing to conduct adequate pre-clinical testing and research to

14    determine the safety of Bextra®;

15    d.    failing to conduct adequate post-marketing surveillance and

16    exposure studies to determine the safety of Bextra®;

17    e.    failing to completely, accurately and in a timely fashion, disclose

18    the results of the pre-marketing testing and post-marketing surveillance and testing to Plaintiffs

19    DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS, ANDERSON, COLEMAN,

20    BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR and HALL, consumers, the

21    medical community, and the FDA;

22    f.    failing to accompany Bextra® with proper warnings regarding all

23    possible adverse side effects associated with the use of Bextra®;

24    g.    failing to use due care in the manufacture, inspection, and labeling

25    of BEXTRA® to prevent the aforementioned risk of injuries to individuals who used Bextra®;

26    h.    failing to use due care in the promotion of Bextra® to prevent the

27    aforementioned risk of injuries to individuals when the drugs were ingested;

28

- 18 -

1          i.       failing to use due care in the sale and marketing of Bextra® to

2   prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

3          j.       failing to use due care in the selling of Bextra® to prevent the

4   aforementioned risk of injuries to individuals when the drugs were ingested;

5          k.       failing to provide adequate and accurate training and information to

6   the sales representatives who sold Bextra®;

7          l.       failing to provide adequate and accurate training and information to

8   healthcare providers for the appropriate use of Bextra®; and

9          m.       being otherwise reckless, careless and/or negligent.

10         98.     Despite the fact that Defendants knew or should have known that Bextra®

11  caused unreasonable and dangerous side effects which many users would be unable to remedy by

12  any means, Defendants continued to promote and market Bextra® to consumers, including

13  Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS, ANDERSON,

14  COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR and HALL,

15  when safer and more effective methods of pain relief were available.

16         99.     Defendants were, or should have been, had they exercised reasonable care,

17  in possession of evidence demonstrating that Bextra® caused serious side effects. Nevertheless,

18  they continued to market their products by providing false and misleading information with regard

19  to the safety and efficacy of Bextra®.

20         100.    Defendants knew or should have known that consumers such as Plaintiffs

21  DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS, ANDERSON, COLEMAN, BELL,

22  WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR and HALL would foreseeably

23  suffer injury as a result of their failure to exercise ordinary care as described above.

24         101.    As a direct and proximate consequence of Defendants' acts, omissions, and

25  misrepresentations described herein, the Plaintiff and wife suffered loss of support and services

26  and endured mental pain and suffering and loss of consortium of her husband. The losses are

27  permanent and continuing in nature. Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN,

28  WILLIAMS, ANDERSON, COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON,

- 19 -

1  KEYS, TAYLOR and HALL required healthcare and services incurring direct medical losses and
2  costs including care for hospitalization, physician care, monitoring, treatment, medications, and
3  supplies.

4      102.    Defendants' conduct was committed with knowing, conscious, wanton,
5  willful, and deliberate disregard for the value of human life and the rights and safety of consumers,
6  including Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS, ANDERSON,
7  COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR and HALL,
8  thereby entitling Plaintiffs to punitive and exemplary damages so as to punish Defendants and
9  deter them from similar conduct in the future.

10      103.    WHEREFORE, Plaintiffs demand judgment against Defendants and seeks
11  compensatory damages, and exemplary and punitive damages together with interest, the costs of
12  suit and attorneys' fees and such other and further relief as this Court deems just and proper.

13
14  **SECOND CLAIM FOR RELIEF:**
**Strict Liability**

15      104.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint
16  as if fully set forth herein and further alleged as follows:

17      105.    At all times relevant to this action, Defendants were suppliers of
18  BEXTRA®, placing the drug into the stream of commerce. BEXTRA® was expected to and did
19  reach Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS, ANDERSON,
20  COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR and HALL
21  without substantial change in the condition in which it was manufactured and sold.

22      106.    BEXTRA® was unsafe for normal or reasonably anticipated use.

23      107.    BEXTRA® was defective in design or formulation because when it left the
24  hands of the manufacturer and/or supplier, it was unreasonably dangerous and more dangerous
25  than an ordinary consumer would expect. BEXTRA® was also defective and unreasonably
26  dangerous in that the foreseeable risk of injuries from BEXTRA® exceeded the benefits associated
27  with the design and/or formulation of the product.

28

1    108. Bextra® is unreasonably dangerous: a) in construction or composition as

2 provided in R.S. 9:2800.55; b) in design as provided in R.S. 9:2800.56; c) because an adequate

3 warning about the product was not provided as required by R.S. 9:2800.57; d) because it does not

4 conform to an express warranty of the manufacturer about the product as provided in R.S.

5 9:2800.58.

6    109. The characteristics of Bextra® that render it unreasonably dangerous under

7 R.S. 9:2800.55, et seq., existed at the time the product left the control of the manufacturer or

8 resulted from a reasonably anticipated alteration or modification of the product.

9    110. The BEXTRA® manufactured and supplied by Defendants was also

10 defective due to inadequate warnings, and/or inadequate clinical trials, testing and study, and

11 inadequate reporting regarding the results of the clinical trials, testing and study. Defendants failed

12 to perform adequate testing before exposing Plaintiffs DAVIS, FREENY, COBURN, SMITH,

13 ALLEN, WILLIAMS, ANDERSON, COLEMAN, BELL, WADE, JACKSON, BENNETT,

14 PATTON, KEYS, TAYLOR and HALL to the medication, testing which would have shown that

15 BEXTRA® had the potential to cause serious side effects including strokes like that which

16 affected Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS, ANDERSON,

17 COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR and HALL.

18    111. The BEXTRA® manufactured and supplied by Defendants was defective

19 due to inadequate post-marketing warnings or instructions because, after Defendants knew or

20 should have known of the risk of injuries from BEXTRA®, they failed to provide adequate

21 warnings to the medical community and the consumers, to whom they were directly marketing and

22 advertising BEXTRA®; and, further, it continued to affirmatively promote BEXTRA® as safe and

23 effective.

24    112. BEXTRA® was manufactured, distributed, tested, sold, marketed,

25 advertised and promoted defectively by Defendants, and as a direct and proximate cause of

26 Defendants' defective design of BEXTRA®, Plaintiff's DAVIS, FREENY, COBURN, SMITH,

27 ALLEN, WILLIAMS, ANDERSON, COLEMAN, BELL, WADE, JACKSON, BENNETT,

28 PATTON, KEYS, TAYLOR and HALL used BEXTRA® rather than other safer and cheaper

- 21 -

1    NSAIDs. As a result, Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS,
2    ANDERSON, COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR
3    and HALL suffered the personal injuries described above.

4          113.    Information given by Defendants to the medical community and to the
5    consumers concerning the safety and efficacy of BEXTRA®, especially the information contained
6    in the advertising and promotional material, did not accurately reflect the potential side effects of
7    BEXTRA®.

8          114.    Had adequate warnings and instructions been provided, Plaintiffs DAVIS,
9    FREENY, COBURN, SMITH, ALLEN, WILLIAMS, ANDERSON, COLEMAN, BELL, WADE,
10   JACKSON, BENNETT, PATTON, KEYS, TAYLOR and HALL would not have taken
11   BEXTRA® as he did, and would not have been at risk of the harmful side effects described herein.

12         115.    Defendants acted with conscious and deliberate disregard of the foreseeable
13   harm caused by BEXTRA®.

14         116.    Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS,
15   ANDERSON, COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR
16   and HALL could not, through the exercise of reasonable care, have discovered BEXTRA®'s
17   defects or perceived the dangers posed by the drug.

18         117.    As a direct and proximate consequence of Defendants' acts, omissions, and
19   misrepresentations described herein, the Plaintiff and his wife suffered loss of support and services
20   and endured mental pain and suffering and loss of consortium of DAVIS, FREENY, COBURN,
21   SMITH, ALLEN, WILLIAMS, ANDERSON, COLEMAN, BELL, WADE, JACKSON,
22   BENNETT, PATTON, KEYS, TAYLOR and HALL. The losses are permanent and continuing in
23   nature. Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS, ANDERSON,
24   COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR and HALL
25   sustained serious cardiovascular injuries. Plaintiffs DAVIS, FREENY, COBURN, SMITH,
26   ALLEN, WILLIAMS, ANDERSON, COLEMAN, BELL, WADE, JACKSON, BENNETT,
27   PATTON, KEYS, TAYLOR and HALL required healthcare and services incurring direct medical
28

1  losses and costs including care for hospitalization, physician care, monitoring, treatment,
2  medications, and supplies.

3      118.    Defendants' conduct was committed with knowing, conscious, wanton,
4  willful, and deliberate disregard for the value of human life and the rights and safety of consumers,
5  including Plaintiff's DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS, ANDERSON,
6  COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR and HALL,
7  thereby entitling Plaintiff to punitive and exemplary damages so as to punish Defendants and deter
8  them from similar conduct in the future.

9      119.    WHEREFORE, Plaintiffs demand judgment against Defendants and seeks
10  compensatory damages, and punitive and exemplary damages together with interest, the costs of
11  suit and attorneys' fees and such other and further relief as this Court deems just and proper.

12

13                      **THIRD CLAIM FOR RELIEF:**
                        **Breach of Express Warranty**

14      120.    Plaintiffs incorporate by reference all of the paragraphs of this Complaint as
15  if fully set forth herein.

16      121.    Defendants expressly represented to Plaintiffs DAVIS, FREENY,
17  COBURN, SMITH, ALLEN, WILLIAMS, ANDERSON, COLEMAN, BELL, WADE,
18  JACKSON, BENNETT, PATTON, KEYS, TAYLOR and HALL and other consumers and the
19  medical community that BEXTRA® was safe and fit for its intended purposes, that it was of
20  merchantable quality, that it did not produce any dangerous side effects, particularly any
21  unwarned-of side effects, and that it was adequately tested.

22      122.    These warranties came in the form of:

23          a.      Defendants' public written and verbal assurances of the safety and
24  efficacy of BEXTRA®;

25          b.      Press releases, interviews and dissemination via the media of
26  promotional information, the sole purpose of which was to create an increased demand for
27  BEXTRA®, which failed to warn of the risk of injuries inherent to the ingestion of BEXTRA®,
28  especially to the long-term ingestion of BEXTRA®;

                            - 23 -

1          c.        Verbal and written assurances made by Defendants regarding

2    BEXTRA® and downplaying the risk of injuries associated with the drug;

3          d.        False and misleading written information, supplied by Defendants,

4    and published in the Physician's Desk Reference on an annual basis, upon which physicians

5    relied in prescribing BEXTRA® during the period of Plaintiffs DAVIS, FREENY, COBURN,

6    SMITH, ALLEN, WILLIAMS, ANDERSON, COLEMAN, BELL, WADE, JACKSON,

7    BENNETT, PATTON, KEYS, TAYLOR and HALL ingestion of BEXTRA®, and;

8          e.        Advertisements.

9          123.      The documents referred to above were created by and at the direction of

10    Defendants.

11         124.      Defendants knew or had reason to know that BEXTRA® did not conform to

12    these express representations in that BEXTRA® is neither as safe nor as effective as represented,

13    and that BEXTRA® produces serious adverse side effects.

14         125.      BEXTRA® did not and does not conform to Defendants' express

15    representations because it is not safe, has numerous and serious side effects, including unwarned-of

16    side effects, and causes severe and permanent injuries.

17         126.      Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS,

18    ANDERSON, COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR

19    and HALL, other consumers, and the medical community relied upon Defendants' express

20    warranties.

21         127.      As a direct and proximate consequence of Defendants' acts, omissions, and

22    misrepresentations described herein, the Plaintiff and his wife suffered loss of support and services

23    and endured mental pain and suffering and loss of consortium of her husband. The losses are

24    permanent and continuing in nature. Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN,

25    WILLIAMS, ANDERSON, COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON,

26    KEYS, TAYLOR and HALL sustained serious cardiovascular injuries.    Plaintiffs DAVIS,

27    FREENY, COBURN, SMITH, ALLEN, WILLIAMS, ANDERSON, COLEMAN, BELL, WADE,

28    JACKSON, BENNETT, PATTON, KEYS, TAYLOR and HALL required healthcare and services

- 24 -

1  incurring direct medical losses and costs including care for hospitalization, physician care,
2  monitoring, treatment, medications, and supplies.

3          128.    Defendants' conduct was committed with knowing, conscious, wanton,
4  willful, and deliberate disregard for the value of human life and the rights and safety of consumers,
5  including Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS, ANDERSON,
6  COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR and HALL,
7  thereby entitling Plaintiffs to punitive and exemplary damages so as to punish Defendants and
8  deter them from similar conduct in the future.

9          129.    WHEREFORE, Plaintiffs demand judgment against Defendants and seeks
10  compensatory damages, and punitive and exemplary damages together with interest, the costs of
11  suit and attorneys' fees and such other and further relief as this Court deems just and proper.

12
13
                        **FOURTH CLAIM FOR RELIEF:**
                        **Breach of Implied Warranty**

14          130.    Plaintiffs incorporate by reference all of the paragraphs of this Complaint as
15  if fully set forth herein.

16          131.    Defendants manufactured, distributed, advertised, promoted, and sold
17  BEXTRA®.

18          132.    At all relevant times, Defendants knew of the use for which BEXTRA® was
19  intended and impliedly warranted the product to be of merchantable quality and safe and fit for
20  such use.

21          133.    Defendants were aware that consumers, including Plaintiff MELVIN
22  DAVIS would use BEXTRA® for treatment of pain and inflammation and for other purposes.

23          134.    Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS,
24  ANDERSON, COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR
25  and HALL and the medical community reasonably relied upon Defendants' judgment and
26  expertise to only sell them or allow them to prescribe BEXTRA® only if it was indeed of
27  merchantable quality and safe and fit for its intended use. Consumers, including Plaintiffs DAVIS,
28  FREENY, COBURN, SMITH, ALLEN, WILLIAMS, ANDERSON, COLEMAN, BELL, WADE,

1  JACKSON, BENNETT, PATTON, KEYS, TAYLOR and HALL, and the medical community,
2  reasonably relied upon Defendants' implied warranty for BEXTRA®.

3          135.    BEXTRA® reached consumers, including Plaintiffs DAVIS, FREENY,
4  COBURN, SMITH, ALLEN, WILLIAMS, ANDERSON, COLEMAN, BELL, WADE,
5  JACKSON, BENNETT, PATTON, KEYS, TAYLOR and HALL without substantial change in the
6  condition in which it was manufactured and sold by Defendants.

7          136.    Defendants breached their implied warranty to consumers, including
8  Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS, ANDERSON,
9  COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR and HALL;
10  BEXTRA® was not of merchantable quality or safe and fit for its intended use.

11          137.    As a direct and proximate consequence of Defendants' acts, omissions, and
12  misrepresentations described herein, the Plaintiff and his wife suffered loss of support and services
13  and endured mental pain and suffering and loss of consortium of her husband. The losses are
14  permanent and continuing in nature. Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN,
15  WILLIAMS, ANDERSON, COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON,
16  KEYS, TAYLOR and HALL sustained serious cardiovascular injuries.    Plaintiffs DAVIS,
17  FREENY, COBURN, SMITH, ALLEN, WILLIAMS, ANDERSON, COLEMAN, BELL, WADE,
18  JACKSON, BENNETT, PATTON, KEYS, TAYLOR and HALL required healthcare and services
19  incurring direct medical losses and costs including care for hospitalization, physician care,
20  monitoring, treatment, medications, and supplies.

21          138.    Defendants' conduct was committed with knowing, conscious, wanton,
22  willful, and deliberate disregard for the value of human life and the rights and safety of consumers,
23  including Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS, ANDERSON,
24  COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR and HALL,
25  thereby entitling Plaintiffs to punitive and exemplary damages so as to punish Defendants and
26  deter them from similar conduct in the future.

27

28

- 26 -

1    139.    WHEREFORE, Plaintiffs demand judgment against Defendants and seeks

2    compensatory damages and punitive and exemplary damages together with interest, the costs of

3    suit and attorneys' fees, and such other and further relief as this Court deems just and proper.

4

5
**FIFTH CLAIM FOR RELIEF:**
**Fraudulent Misrepresentation & Concealment**

6    140.    Plaintiffs incorporate by reference all of the paragraphs of this Complaint as

7    if fully set forth herein.

8    141.    Defendants' superior knowledge and expertise, their relationship of trust and

9    confidence with doctors and the public, their specific knowledge regarding the risks and dangers of

10   BEXTRA®, and their intentional dissemination of promotional and marketing information about

11   BEXTRA® for the purpose of maximizing its sales, each gave rise to the affirmative duty to

12   meaningfully disclose and provide all material information about BEXTRA®'s risks and harms to

13   doctors and consumers.

14   142.    Defendants made fraudulent affirmative misrepresentations with respect to

15   BEXTRA® in the following particulars:

16   f.    Defendants    represented    through    their    labeling,    advertising,

17   marketing materials, detail persons, seminar presentations, publications, notice letters, and

18   regulatory submissions that BEXTRA® had been tested and found to be safe and effective for the

19   treatment of pain and inflammation; and

20   g.    Defendants represented that BEXTRA® was safer than other

21   alternative medications.

22   143.    Defendants    made    affirmative    misrepresentations;    and    fraudulently,

23   intentionally and/or recklessly concealed material adverse information regarding the safety and

24   effectiveness of BEXTRA®.

25   144.    Defendants made these misrepresentations and actively concealed adverse

26   information at a time when Defendants knew or had reason to know that BEXTRA® had defects

27   and was unreasonably dangerous and was not what Defendants had represented to the medical

28   community, the FDA and the consuming public, including Plaintiffs DAVIS, FREENY,

- 27 -

1  COBURN, SMITH, ALLEN, WILLIAMS, ANDERSON, COLEMAN, BELL, WADE,
2  JACKSON, BENNETT, PATTON, KEYS, TAYLOR and HALL.

3          145.   Defendants omitted, suppressed and/or concealed material facts concerning
4  the dangers and risk of injuries associated with the use of BEXTRA® including, but not limited to,
5  the cardiovascular, cerebrovascular, and other serious health risks. Furthermore, Defendants'
6  purpose was willfully blind to, ignored, downplayed, avoided, and/or otherwise understated the
7  serious nature of the risks associated with the use of BEXTRA® in order to increase its sales.

8          146.   The representations and concealment were undertaken by Defendants with
9  an intent that doctors and patients, including Plaintiffs DAVIS, FREENY, COBURN, SMITH,
10  ALLEN, WILLIAMS, ANDERSON, COLEMAN, BELL, WADE, JACKSON, BENNETT,
11  PATTON, KEYS, TAYLOR and HALL, rely upon them.

12          147.   Defendants' representations and concealments were undertaken with the
13  intent of defrauding and deceiving Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN,
14  WILLIAMS, ANDERSON, COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON,
15  KEYS, TAYLOR and HALL, other consumers, and the medical community to induce and
16  encourage the sale of BEXTRA®.

17          148.   Defendants' fraudulent representations evinced their callous, reckless,
18  willful, and depraved indifference to the health, safety, and welfare of consumers, including
19  Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS, ANDERSON,
20  COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR and HALL.

21          149.   Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS,
22  ANDERSON, COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR
23  and HALL physician and Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS,
24  ANDERSON, COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR
25  and HALL relied on and were induced by Defendants' misrepresentations, omissions, and/or active
26  concealment of the dangers of BEXTRA® in selecting BEXTRA® treatment.

27          150.   Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS,
28  ANDERSON, COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR

- 28 -

1    and HALL and the treating medical community did not know that the representations were false

2    and were justified in relying upon Defendants' representations.

3    151.    Had    Plaintiffs    DAVIS,    FREENY,    COBURN,    SMITH,    ALLEN,

4    WILLIAMS, ANDERSON, COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON,

5    KEYS, TAYLOR and HALL been aware of the increased risk of side effects associated with

6    BEXTRA® and the relative efficacy of BEXTRA® compared with other readily available

7    medications,    Plaintiffs    DAVIS,    FREENY,    COBURN,    SMITH,    ALLEN,    WILLIAMS,

8    ANDERSON, COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR

9    and HALL would not have taken BEXTRA® as he did.

10    152.    As a direct and proximate consequence of Defendants' acts, omissions, and

11    misrepresentations described herein, the Plaintiff and his wife suffered loss of support and services

12    and endured mental pain and suffering and loss of consortium of her husband. The losses are

13    permanent and continuing in nature. Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN,

14    WILLIAMS, ANDERSON, COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON,

15    KEYS, TAYLOR and HALL sustained serious cardiovascular injuries.    Plaintiffs DAVIS,

16    FREENY, COBURN, SMITH, ALLEN, WILLIAMS, ANDERSON, COLEMAN, BELL, WADE,

17    JACKSON, BENNETT, PATTON, KEYS, TAYLOR and HALL required healthcare and services

18    incurring direct medical losses and costs including care for hospitalization, physician care,

19    monitoring, treatment, medications, and supplies.

20    153.    Defendants' conduct was committed with knowing, conscious, wanton,

21    willful, and deliberate disregard for the value of human life and the rights and safety of consumers,

22    including Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS, ANDERSON,

23    COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR and HALL,

24    thereby entitling Plaintiff to punitive and exemplary damages so as to punish Defendants and deter

25    them from similar conduct in the future.

26    154.    WHEREFORE, Plaintiffs demand judgment against Defendants and seeks

27    compensatory damages, and punitive and exemplary damages together with interest, the costs of

28    suit and attorneys' fees, and such other and further relief as this Court deems just and proper.

- 29 -

1

2

**SIXTH CLAIM FOR RELIEF**
**(Unjust Enrichment)**

3      155.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint

4  as if fully set forth herein.

5      156.    At all times relevant to this action, Defendants were the manufacturers,

6  sellers, and/or suppliers of BEXTRA®.

7      157.    Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS,

8  ANDERSON, COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR

9  and HALL paid for BEXTRA® for the purpose of managing his pain safely and effectively.

10      158.    Defendants have accepted payment from Plaintiffs DAVIS, FREENY,

11  COBURN, SMITH, ALLEN, WILLIAMS, ANDERSON, COLEMAN, BELL, WADE,

12  JACKSON, BENNETT, PATTON, KEYS, TAYLOR and HALL for the purchase of BEXTRA®.

13      159.    Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS,

14  ANDERSON, COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR

15  and HALL did not receive the safe and effective pharmaceutical product for which he paid.

16      160.    It is inequitable and unjust for Defendants to retain this money because the

17  Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS, ANDERSON,

18  COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR and HALL did

19  not in fact receive the product Defendant represented BEXTRA® to be.

20      161.    WHEREFORE, Plaintiffs demand judgment against Defendants and seeks

21  equitable relief, the costs of suit and attorneys' fees, and such other and further relief as this Court

22  deems just and proper.

23

24                          **PRAYER FOR RELIEF**

25          WHEREFORE, Plaintiffs request the following relief:

26      162.    General damages in excess of the jurisdictional amount of this Court;

27      163.    Consequential damages;

28      164.    Disgorgement of profits;

- 30 -

165. Restitution;

166. Punitive and exemplary damages;

167. Pre-judgment and post-judgment interest as provided by law;

168. Plaintiff Hall seeks non-economic damages of a reasonable sum but not less than $50,000.00.

169. Recovery of Plaintiffs DAVIS, FREENY, COBURN, SMITH, ALLEN, WILLIAMS, ANDERSON, COLEMAN, BELL, WADE, JACKSON, BENNETT, PATTON, KEYS, TAYLOR and HALL's costs including, but not limited to, discretionary Court costs of these causes, and those costs available under the law, as well as expert fees and attorneys' fees and expenses, and costs of this action; and

170. Such other and further relief as the Court deems just and proper.

1

DEMAND FOR JURY TRIAL

2

Plaintiffs demand a trial by jury on all claims so triable in this action.

3

4

Respectfully submitted,
THE WHITEHEAD LAW FIRM, L.L.C.

5

6

By:

7

C. Mark Whitehead, III
Bar No. 27682

8

cmw@whitehead.com
Post Office Box 81007

9

Lafayette, LA 70598
337 740-6006 Telephone

10

337 740-6002 Facsimile

11

12

Attorneys for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28